UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| KNOX TL LOT ACQUISITION, LLC and MILLSTONE PARTNERS, LLC, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 3:21-CV-00374-JRG-DCP |
| FIRST AMERICAN TITLE INSURANCE COMPANY, | ) ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM OPINION AND ORDER

This case is a derivative breach of contract action arising from a case in the Chancery Court for Knox County, Tennessee (the "*Detrana* Litigation"). [*See Detrana v. Daniel* (Docket No. 196470-2).] Plaintiffs Knox TL Lot Acquisition, LLC ("Knox TL") and Millstone Partners, LLC ("Millstone" (and collectively with Knox TL the "Insureds")) argue that their title insurer, First American Title Insurance Company ("First American"), breached their title insurance policies by failing to indemnify them for their settlement of the *Detrana* Litigation and failing to defend Knox TL.

Now, this action is before the Court on First American's Motion for Summary Judgment [Doc. 39], the Insureds' Response in Opposition [Doc. 44], and First American's Reply [Doc. 46]. For the reasons stated below, First American's motion is **GRANTED IN PART**, as to the Insureds' failure to indemnify claims, and **DENIED IN PART**, as to Knox TL's failure to defend claim.

1

**Knox TL Purchases Land and Obtains a Title Insurance Policy from First American.**

Knox TL is a property development company owned by Scott Smith and Eric Moseley. [Smith Dep., Doc. 40-2 at PageID 696–97 (8:17–9:2, 12:7–11).] Millstone is a home builder owned by Mr. Smith, Mr. Moseley, and Ben Testerman. [*Id.* at PageID 697 (10:16–11:4, 12:7–11).] Together, the Insureds develop residential properties and sell homes—Knox TL buys raw land and develops it into residential lots that it sells to Millstone, which builds houses on the lots and sells them to customers. [*Id.* at PageID 697 (12:7–11).]

In October 2017, Knox TL purchased 22.35 acres of land in Knoxville, Tennessee ("Tract 1") from Charles Edward Daniel and Thomas J. Overton for the purpose of building Phase I of a three-phase residential subdivision called The Glen at West Valley (the "Glen"). [First American's Statement of Undisputed Facts, Doc. 40 ¶¶ 1–2.] Mr. Daniel and Mr. Overton also owned two adjoining properties ("Tract 2" and "Tract 3") that Knox TL planned to buy later for Phase II of the Glen. [*Id.* ¶ 3.]

In connection with its purchase of Tract 1, Knox TL obtained an Owner's Policy of Title Insurance from First American (the "Knox TL Policy"). [*Id.* ¶ 4; Knox TL Policy, Doc. 1-1 at PageID 28–42.] The Knox TL Policy insured Knox TL against losses or damage incurred by reasons of defects, liens, and encumbrances on the title to Tract 1. [First American's Statement of Undisputed Facts, Doc. 40 ¶ 5.]

Under the Knox TL Policy, First American had a duty to defend Knox TL in actions involving the title to Tract 1 at its own cost and without unreasonable delay

(Section 5(a)). [Knox TL Policy, Doc. 1-1 at PageID 34.] In accord with its duty to defend, First American retained the right to pursue litigation to final determination (Section 5(c)); limited its liability to final judgments (Section 9(b)); and conditioned the settlement of any claims or lawsuits on its prior written consent (Section 9(c)). [*Id.* at PageID 35–36.] The relevant text of these provisions is as follows:

Section 5(a), Duty to Defend

Upon written request by the insured … [First American], at its own cost and without unreasonable delay, shall provide for the defense of an Insured in litigation which any third party asserts a claim covered by this policy adverse to the Insured. This obligation is limited only to those causes of action alleging matters Insured against by this policy. [First American] shall have the right to select counsel of its choice (subject to the right of the Insured to object for reasonable cause) to represent the Insured as to these stated causes of action. It shall not be liable for and will not pay the fees of any other counsel. [First American] will not pay any fees, costs, or expenses incurred by the Insured in defense of those causes of action that allege matters not insured against by this policy.

Section 5(c), Right of Final Determination

Whenever [First American] brings an action or asserts a defense as required or permitted by this policy, [First American] may pursue the litigation to a final determination by a court of competent jurisdiction, and it expressly reserves the right, in its sole discretion, to appeal any adverse judgment or order.

Section 9(b), Liability Limited to Final Judgments

"[First American] shall have no liability for loss or damage until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals, adverse to the Title, as insured[.]"

Section 9(c), Consent Requirement

[First American] shall not be liable for loss or damage to the insured for liability voluntarily assumed by the Insured in settling any claim or suit without the prior written consent of [First American].

3

[*Id.* at PageID 34–36.]

Additionally, Mr. Daniel and Mr. Overton had title insurance policies with Fidelity National Title Insurance ("Fidelity") for Tracts 2 and 3. [Smith Dep., Doc. 40-2 at PageID 716 (87:11–88:22).] Mr. Daniel and Mr. Overton are not parties to this case and the Fidelity policies are not at issue. Nevertheless, the Insureds, in opposition to First American's motion for summary judgment, make arguments related to First American's contacts with Fidelity.

**The *Detrana* Litigation Begins and Knox TL Tenders its Defense to First American.**

On August 14, 2018, landowners whose property abutted Tracts 1, 2, and 3 (the "*Detrana* Plaintiffs") sued Knox TL, S&E Properties, LLC (another entity owned by Mr. Smith and Mr. Moseley), Mr. Daniel, and Mr. Overton, (the "*Detrana* Defendants" (and collectively with the *Detrana* Plaintiffs the "*Detrana* Parties")) in the Chancery Court for Knox County, Tennessee. [First American's Statement of Undisputed Facts, Doc. 40 ¶ 8.] The *Detrana* Plaintiffs brought the litigation to enforce deed restrictions in some of the Tracts' titles. If enforced, the deed restrictions would likely reduce the number of lots that Knox TL could develop for the Glen. [*Id.* ¶¶ 9–10.]

Knox TL was served with the *Detrana* Plaintiffs' complaint on August 22, 2018. [*Id.* ¶ 11.] Then, the *Detrana* Defendants jointly retained attorney Lewis Howard to defend them. [*Id.* ¶ 12.] Mr. Howard filed their answer on September 13, 2018, and, on September 14, 2018, he filed their motion for summary judgment. [*Id.* ¶¶ 12–13.]

While Mr. Howard was making the *Detrana* Defendants' initial filings, Knox TL, through its title agent East Tennessee Title Insurance Agency ("East Tennessee

4

Title"), tendered its defense to First American. On August 31, 2018, East Tennessee Title submitted Knox TL's tender to First American. [Insureds' Counter-statement of Undisputed Facts, Doc. 45 ¶ 80.] On September 4, 2018, First American sent an acknowledgement letter to East Tennessee Title confirming receipt of the claim. [*Id.* ¶ 82.] On September 11, 2018, First American gave notice to East Tennessee Title that it was investigating the claim and, the next day, Jessica Ladwig, First American's Claims Counsel sent a letter to East Tennessee Title asking for a copy of its policy file. [*Id.* ¶¶ 83–85, 90.] On September 18, 2019, East Tennessee Title provided Ms. Ladwig with the additional information. [*Id.* ¶ 87.]

On October 11, 2018, Ms. Ladwig sent a letter to Mr. Smith informing him that First American had partially accepted Knox TL's claims under a reservation of rights and that it had retained Erika Barnes as counsel for those claims. [*Id.* ¶ 87; Letter Ladwig to Smith (Oct. 11, 2018), Doc. 45-1 at PageID 1044–49.] In her letter, Ms. Ladwig explained that, although Ms. Barnes had been retained to defend Knox TL, she was not retained to provide coverage advice regarding the Knox TL Policy. [Letter Ladwig to Smith (Oct. 11, 2018), Doc. 45-1 at PageID 1048.] Despite First American retaining Ms. Barnes, Mr. Howard continued to represent Knox TL and the other *Detrana* Defendants and acted as lead counsel in the *Detrana* Litigation.

**The *Detrana* Parties Mediate and Settlement Negotiations Begin.**

As a matter of background, in the summer of 2019 Knox TL was under no real pressure to settle the *Detrana* Litigation. Pursuant to their plans to develop the Glen, in early 2019, Knox TL began selling lots to Millstone—these lots were not

5

encumbered by the deed restrictions at issue in the litigation. [*Id.* ¶ 23.] And, by late 2019, Millstone had fourteen houses worth approximately $5,000,000 under contract and closings scheduled to begin in early August. [*Id.* ¶ 38.]. Additionally, in connection with its purchase of the lots, Millstone obtained an Owner's Policy of Title Insurance from First American (the "Millstone Policy"). [*Id.* ¶ 24; Millstone Policy, Doc. 1-1 at PageID 84–94.] The Millstone Policy contained the same conditions and exclusions as the Knox TL Policy—First American assumed the duty to defend Millstone in actions involving the properties' titles and it retained the right to pursue any litigation to final determination, limited its liability to final judgments, and conditioned the settlement of any claims or lawsuits on its prior written consent. [*Id.* ¶ 25; Insureds' Counter-statement of Undisputed Facts, Doc. 45 ¶ 25.] The Millstone Policy also included a provision excluding any losses or damages related to the *Detrana* Litigation. [Insureds' Counter-statement of Undisputed Facts, Doc. 45 ¶ 25.]

In June 2019, the *Detrana* Parties participated in mediation. [First American's Statement of Undisputed Facts, Doc. 40 ¶ 26.] The *Detrana* Defendants were represented by Mr. Howard and Ms. Barnes and, although she did not attend the mediation, Ms. Ladwig was forwarded a copy of the *Detrana* Defendants' mediation statement. [*Id.* at 27; Insureds' Counter-statement of Undisputed Facts, Doc. 45 ¶ 95.] At the mediation, the *Detrana* Plaintiffs made a $400,000 settlement demand. [First American's Statement of Undisputed Facts, Doc. 40 ¶ 27.] The *Detrana* Defendants rejected the demand and walked out without making a counteroffer. [*Id.*]

On July 9, 2019, counsel for the *Detrana* Plaintiffs called Mr. Howard and made an offer to settle the litigation as it related to the Glen Phase I—the offer was for $100,000 in cash plus the installation of buffer trees to screen the *Detrana* Plaintiffs' properties from the Glen. [First American's Statement of Undisputed Facts, Doc. 40 ¶ 28.] Because the Insureds' development was on schedule and Knox TL did not need to settle, Mr. Howard declined the offer during the phone call. [*Id.* ¶ 29; Email Howard to Daniel, Smith, and Moseley (July 9, 2019, 1:50 p.m.), Doc. 40-1 at PageID 603.] Unfortunately for Knox TL, their position materially changed the next day.

**Millstone is Added to the *Detrana* Litigation.**

On July 10, 2019, the Knox County, Tennessee Chancery Court allowed the *Detrana* Plaintiffs' to amend their complaint to add Millstone as a defendant to the *Detrana* Litigation; even though the lots that Millstone purchased from Knox TL were not encumbered by the deed restrictions at issue in the case. [First American's Statement of Undisputed Facts, Doc. 40 ¶¶ 23, 30–32.] By adding Millstone as a defendant, the *Detrana* Plaintiffs were able to cloud the titles of the houses that Millstone had under contract and, with a late August trial date, put its early August closings in jeopardy. [*Id.* ¶¶ 33–38.]

Thus, with their funds effectively frozen and interest accruing on their construction loans, the Insureds' settlement equation was changed. As Mr. Testerman described it, by adding Millstone, the *Detrana* Plaintiffs put them "over a

barrel[.]" [*Id.* ¶ 37.] Likewise, Mr. Smith believed that the Insureds had no choice but to settle. [*Id.* at ¶ 36.]

**The *Detrana* Parties Settle.**

Empowered by the addition of Millstone, on July 18, 2019, the *Detrana* Plaintiffs sent Mr. Howard an increased settlement demand. [*Id.* ¶ 39.] Now, they demanded $250,000 cash, the installation of buffer trees, a strip of land for a particular plaintiff, and an agreement that the Glen's Phase II lots would be no smaller than 0.33 acres. [*Id.* ¶ 40.]

On July 19, 2019, Mr. Howard hand-delivered a counteroffer to the *Detrana* Plaintiffs' counsel for $100,000 cash, the installation of buffer trees, a strip of land for a particular plaintiff, and a reservation of rights for the *Detrana* Plaintiffs to contest the Glen's Phase II development later. [*Id.* ¶ 42; Letter Howard to Tallent (July 19, 2019), Doc. 40-1 at PageID 635–36.] That same morning, after learning about these settlement discussions, Ms. Ladwig sent Mr. Howard a letter. [First American's Statement of Undisputed Facts, Doc. 40 ¶ 43; Letter Ladwig to Howard (July 19, 2019), Doc. 40-1 at PageID 639.] In her letter, she explained that First American "is willing to contribute $50,000 toward this settlement *if the Insured is willing to provide a release of First American for any other claim related to this litigation*." [Letter Ladwig to Howard (July 19, 2019), Doc. 40-1 at PageID 639 (emphasis added).] Further, she reminded Mr. Howard that under 9(c) of the Knox

8

TL policy, Knox TL was required to get First American's written consent before entering into a settlement.[1] [*Id.*]

That afternoon, Mr. Howard emailed a modified counteroffer to the *Detrana* Plaintiffs' counsel—$250,000 in cash, the installation of buffer trees, a strip of land for a particular plaintiff, and an agreement to limit the Glen's Phase II to sixty-four lots. [First American's Statement of Undisputed Facts, Doc. 40 ¶ 45.] After Ms. Ladwig learned about the modified counteroffer, she emailed Mr. Howard asking him to call her to discuss; her email read: "In follow up to my previous correspondence, attached, I have now been informed that additional settlement discussions have occurred and that the Insured may have agreed to terms proposed by the Plaintiffs that were not authorized by First American. Please contact me to discuss further." [*Id.* ¶ 47; Email Ladwig to Howard (July 19, 2019, 2:05 p.m.), Doc. 40-1 at PageID 637.] Later that afternoon, Ms. Ladwig and Mr. Howard spoke on the phone and she sent an email memorializing their call where she indicated that she invoked the consent requirement again:

> Thank you for taking the time to discuss this matter with me this afternoon. To follow up, you indicated that the Insured is aware of Paragraph 9(c) of the Conditions in the [Knox TL] Policy indicating that First American is not liable to the Insured for settlements agreed to by

---

[1] The record indicates that Ms. Ladwig was on summer vacation from July 8, 2019 through July 12, 2019. [Email Ladwig to Hawkins (July 5, 2019, 10:52 a.m.), Doc. 45-1 at PageID 1087 ("I will be out of the office all next week, so will be unable to discuss this further after today until I return on Monday, July 15.").] Thus, it appears to the Court that Ms. Ladwig's letter was in response to the *Detrana* Plaintiffs' July 9, 2019 demand. Nevertheless, First American's Statement of Undisputed Facts provides that the letter was in response to Mr. Howard's counteroffer, and the Insureds have not contested this fact. [First American's Statement of Undisputed Facts, Doc. 40 ¶43; Insureds' Counter-statement of Undisputed Facts, Doc. 45 ¶ 43.]

9

the insured without prior written consent of First American. You indicated that settlement discussions are ongoing, and I requested that First American be kept involved in settlement discussions to the extent that the Insured desires First American to contribute to the settlement. I asked that any request for payment from First American be submitted in writing so that we may be sure to appropriately respond to any requests. Thank you[.]

[First American's Statement of Undisputed Facts, Doc. 40 ¶¶ 48–49; Email Ladwig to Howard (July 19, 2019, 3:05 p.m.), Doc. 40-1 at PageID 637.]

Even later, on the evening of July 19, Mr. Howard emailed the *Detrana* Defendants, Ms. Ladwig, and Ms. Barnes to notify them about the "[c]urrent settlement discussions" and explained that "the size of lots in phase II is the current sticking point."[2] [First American's Statement of Undisputed Facts, Doc. 40 ¶ 51; Email Howard to Ladwig, Barnes, Daniel, Smith, Moseley, and Wallen (July 19, 2019, 5:46 p.m.), Doc. 40-1 at PageID 649.] A few days later, on July 23, 2019, Ms. Ladwig responded to Mr. Howard and stated that "First American's previous offer to contribute $50,000 toward full settlement of this matter remains on the table at this time. … First American will also agree to contribute $20,000 toward the buffer trees to assist in facilitating the settlement." [Email Ladwig to Howard (July 23, 2019, 12:03 p.m.), Doc. 40-1 at PageID 649.]

The next day, the *Detrana* Plaintiffs accepted the modified counteroffer (the "Settlement") and sent Mr. Howard a proposed settlement agreement. [First

---

[2] Again, based on the this email, it appears to the Court that First American's characterization of the sequence of events on July 19 is slightly off. Nevertheless, because the Insureds have not disputed the sequence of events and because they are not material to the Court's holding, it will accept them as they were presented.

American's Statement of Undisputed Facts, Doc. 40 ¶ 52; Email Tallent to Howard, Barnes, and Lawrence (July 24, 2019, 7:14 p.m.), Doc. 40-1 at PageID 623.] About thirty minutes later, after reviewing the proposed settlement agreement, Mr. Howard emailed Mr. Smith, Mr. Daniel, and Mr. Moseley and stated "[W]e need to determine … what the insurance companies will contribute. [Email Howard to Smith, Daniel, and Moseley (July 24, 2019, 7:37 p.m.), Doc. 40-1 at PageID 626.] That night, Mr. Smith emailed Mr. Howard, Mr. Moseley, and Mr. Daniel and stated that the group needed to "get together to address the reimbursement of costs from the two title companies." [Email Smith to Moseley (July 24, 2019, 9:27 p.m.), Doc. 40-1 at PageID 629.]

**Post-Settlement Activities.**

After the *Detrana* Parties entered into the Settlement and while they were finalizing and executing their settlement agreement (the "Settlement Agreement"), Mr. Howard and Mr. Smith contacted Ms. Ladwig several times inquiring whether First American would fund the Settlement and asking for First American to contribute increased amounts towards it. [First American's Statement of Undisputed Facts, Doc. 40 ¶¶ 56, 59, 66, 73; Email Howard to Ladwig and Shriver (July 25, 2019, 10:01 a.m.), Doc. 40-1 at PageID 621–22; Email Howard to Shriver and Ladwig (July 25, 2019, 12:14 p.m.), Doc. 40-1 at PageID 619; Email Smith to Ladwig (Aug. 9, 2019, 1:24 p.m.), Doc. 40-8 at PageID 918; Email Smith to Ladwig (Aug. 22, 2019, 10:12 a.m.), Doc. 40-1 at PageID 692–93.] Eventually, the Insureds demanded that First American contribute $380,000 to the Settlement—$250,000 for their cash settlement,

11

$90,000 in attorney's fees, and $40,000 for buffer trees. [First American's Statement of Undisputed Facts, Doc. 40 ¶ 73; Email Smith to Ladwig (Aug. 22, 2019, 10:12 a.m.), Doc. 40-1 at PageID 692–93.] Ms. Ladwig responded to each request by referencing her previous contribution offer in exchange for a release of First American; although, she ultimately increased the proposed contribution amount to $150,000. [First American's Statement of Undisputed Facts, Doc. 40 ¶¶ 60–61, 74, 76; Email Ladwig to Howard (July 26, 2019, 10:09 a.m.), Doc. 40-1 at PageID 619; Email Ladwig to Smith (Aug. 22, 2019, 1:22 p.m.), Doc. 40-1 at PageID 692; Email Ladwig to Smith (Aug. 22, 2019, 5:10 p.m.), Doc. 40-1 at PageID 691.] For its part, Millstone submitted its claims to First American on August 20, 2019. [First American's Statement of Undisputed Facts, Doc. 40 ¶ 67.]

In addition to Ms. Ladwig's exchanges with the Insureds, Mark Rosser, First American's Underwriting Counsel, worked with them to verify that First American could insure titles for Millstone's houses under contract. [*Id.* ¶¶ 62–64; Insureds' Counter-statement of Undisputed Facts, Doc. 45 ¶¶ 97–98; First American's Reply Statement, Doc. 47 ¶ 98.] In short, Mr. Rosser was tasked with ensuring that any landowner that could seek to enforce the Tracts' deed restrictions was already part of the *Detrana* Litigation, and thus party to the Settlement, or, if they were not, would be willing to waive their right to enforce the restrictions in the future. [*Id.*]

The Insureds' members executed the Settlement Agreement on August 2, 2019, and the *Detrana* Plaintiffs executed it on August 21, 2019. [First American's Statement of Undisputed Facts, Doc. 40 ¶¶ 65, 71.]

12

Ultimately, the Insureds and First American were not able to reach an agreement on contribution. This lawsuit followed.

## PROCEDURAL POSTURE

On October 1, 2021, the Insureds filed this action in the Chancery Court for Knox County, Tennessee, [Complaint, Doc. 1-1 at PageID 11–25], and on November 4, 2021, First American timely removed the action to this Court [Notice of Removal, Doc. 1 at PageID 1–7]. Knox TL asserts two causes of action. First, a claim for failure to defend, arising from First American's delay in appointing counsel to defend it in the *Detrana* Litigation. [Complaint, Doc. 1-1 at PageID 19–21.] Second, a claim for failure to indemnify arising from First American's denial of its $380,000 indemnity claim. [*Id.* at PageID 21–22.] For its part, Millstone asserts a claim for failure to indemnify arising from First American's denial of multiple claims related to its inability to close its contracts related to the *Detrana* Litigation. [*Id.* at PageID 22–24.]

On February 8, 2022, First American answered the Complaint and brought a three-count counterclaim. [Corrected Am. Answer and Countercl., Doc. 18 at PageID 229–48.] Count One asks the Court to declare that First American and Knox TL entered into a binding contribution agreement—$150,000 contribution to the Settlement in exchange for a full release by Knox TL—and to order specific performance of the agreement. [*Id.* at PageID 242–43.] Count Two asks the Court, if it finds that no contribution agreement exists, to declare that First American is not liable to Knox TL on grounds that Knox TL voluntarily assumed liability by settling

13

the *Detrana* Litigation without First American's prior written consent. [*Id.* at PageID 243–45.] Likewise, Count Three asks the Court to declare that First American is not liable to Millstone on grounds that Millstone voluntarily assumed liability by settling the *Detrana* Litigation without First American's prior written consent. [*Id.* at PageID 245–48.] First American's counterclaims are not presently before the Court.

Now, First American has moved for summary judgment on the Insureds' claims against it. Regarding their failure to indemnify claims, First American argues that "because [they] voluntarily settled the [*Detrana* Litigation] on terms they chose and without First American's prior written consent, First American has no indemnity obligation under the policies." [Mot. Summ. J., Doc. 39 at PageID 546.] As for Knox TL's failure to defend claim, First American argues that it cannot make out such a claim because it cannot prove damages. [*Id.*]

The Insureds have responded in opposition and argue that there are genuine issues of material fact that preclude the Court from granting First American's motion for summary judgment. Regarding their indemnity claims, they argue that a reasonable trier of fact could conclude that First American implicitly waived the Policies' consent requirements when it participated in the June 2019 mediation, made contribution offers, and reviewed the Settlement Agreement. [Resp. Opp'n, Doc. 44 at PageID 946–49.] Regarding Knox TL's failure to defend claim, it argues that, based on the amount of time it took First American to respond to its tender of defense and to retain counsel on its behalf, a reasonable trier of fact could conclude that First American unreasonably delayed in responding to its tender—thus, it is entitled to at

least attorney's fees for the period between tendering its claim and First American retaining counsel. [*Id.* at PageID 950–53.]

## LEGAL STANDARD

Summary judgment is proper when the moving party shows, or "point[s] out to the district court," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), that the record—the admissions, affidavits, answers to interrogatories, declarations, depositions, or other materials—is without a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law, Fed. R. Civ. P. 56(a), (c). The moving party has the initial burden of identifying the basis for summary judgment and the portions of the record that lack genuine issues of material fact. *Celotex*, 477 U.S. at 323. The moving party discharges that burden by showing "an absence of evidence to support the nonmoving party's" claim or defense, *id.* at 325, at which point the nonmoving party, to survive summary judgment, must identify facts in the record that create a genuine issue of material fact, *id.* at 324.

Not just any factual dispute will defeat a motion for summary judgment—the requirement is "that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it may affect the outcome of the case under the applicable substantive law, and an issue is "genuine" if the evidence is "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In short, the inquiry is whether the record contains evidence that "presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. When ruling on

15

a motion for summary judgment, a court must view the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. A court may also resolve pure questions of law on a motion for summary judgment. *See Hill v. Homeward Residential, Inc.*, 799 F.3d 544, 550 (6th Cir. 2015).

## ANALYSIS

### I. Insureds' Failure to Indemnify Claims

First American argues that it is entitled to summary judgment on the Insureds' failure to indemnify claims because they settled the *Detrana* Litigation without its prior written consent in violation of the Policies. [Mot. Summ. J., Doc. 39 at PageID 546.] In response, the Insureds argue that because First American was aware of and participated in the June 2019 mediation, made contribution offers towards the Settlement, and reviewed the Settlement Agreement, there are genuine issues of material fact from which a reasonable trier of fact could conclude that First American implicitly waived the consent requirements. [Resp. Opp'n, Doc. 44 at PageID 946–49.] The Court disagrees. First American is entitled to summary judgment on the Insureds' failure to indemnify claims.

### A. Under Tennessee Law, an Insurer Can Implicitly Waive Its Consent Requirement When It Takes No Action to Preserve the Right.

Tennessee's "general rules of contract construction apply to insurance contracts." *Am. Guarantee and Liab. Ins. Co. v. Norfolk S. Ry. Co.*, 278 F.Supp.3d

16

1025, 1037 (E.D. Tenn. 2017) (citing *McKimm v. Bell*, 790 S.W.2d 526, 527 (Tenn. 1990)). Therefore, "[i]nsurance policies should be read 'as a whole in a reasonable and logical manner.'" *Id.* (quoting *Standard Fire Ins. Co. v. Chester O'Donley & Assocs., Inc.*, 972 S.W.2d 1, 7 (Tenn. Ct. App. 1998)). When a policy's language "is clear and unambiguous, 'the literal meaning controls the outcome of the dispute.'" *Nat. Fitness Ctr., Inc. v. Atlanta Fitness, Inc.*, 902 F.Supp.2d 1098, 1105 (E.D. Tenn. 2012) (quoting *Maggart v. Almany Realtors, Inc.*, 259 S.W.3d 700, 703–04 (Tenn. 2008)). Thus, where a policy contains a clear and unambiguous consent requirement, it must be "strictly enforced as written, even if the result seems 'harsh and unjust.'" *Am. Guarantee*, 278 F.Supp.3d at 1051–51 (quoting *State Auto Ins. Co. v. Lashlee-Rich, Inc.*, No. 02A01-9703-CH-00071, 1997 WL 781896, at *7 (Tenn. Ct. App. Dec. 22, 1997)).

Despite the strict enforceability of consent requirements, like any contractual provision, they can be explicitly or implicitly waived. *Gatson v. Tenn. Farmers Mut. Ins. Co.*, 120 S.W.3d 815, 819 (Tenn. 2003) (stating that there is a "long-standing rule in Tennessee that *any* contractual provision of a policy of insurance, whether part of an insuring, exclusionary, or forfeiture clause, may be waived by the acts, representations, or knowledge of the insurer's agent." (emphasis in original) *quoting Bill Brown Constr. Co. v. Glens Falls Ins. Co.*, 818 S.W.2d 1, 13 (Tenn. 1991)). However, "[t]he law will not presume a waiver, and the party claiming the waiver has the burden of proving it by a preponderance of the evidence." *Ky. Nat. Ins. Co. v. Gardner*, 6 S.W.3d 493, 499 (Tenn. Ct. App. 1999) (citing *Koontz v. Fleming*, 65

17

S.W.2d 821, 825 (Tenn. Ct. App. 1933); *Springfield Tobacco Redryers Corp. v. City of Springfield*, 293 S.W.2d 189, 198 (Tenn. Ct. App. 1956)). For implied waivers, this is a difficult task.

To prove an implied waiver, the party challenging it must put forth evidence of "some 'absolute action or inaction inconsistent with the claim or right' waived." *Id.* (citations omitted). Therefore, "the record must show conduct on the part of the insurance carrier which is so clearly inconsistent with an intention to insist upon a strict compliance with the provision at issue that the conduct constitutes an implied waiver." *Id.* (citing *Crumley v. Travelers Indem. Co.*, 475 S.W.2d 654, 658 (Tenn. 1972)). Such a showing is rare for consent requirements. Indeed, courts have found it only in instances where "an insurer receives formal notice of an occurrence and has knowledge of a potential settlement … [and] fails to remind the insured of the condition." *Am. Guarantee*, 278 F.Supp.3d at 1051 (citations omitted).

For example, in *Gatson*, a car accident case, an insurer's claims adjuster failed to notify the insured that she risked losing coverage for failure to obtain consent to settle when the adjuster knew that she sent a demand letter to the other driver's insurance carrier. 120 S.W. 3d at 817–18. The Tennessee Supreme Court reasoned that the insurer's "wait-and-see" approach to enforcement of it policy provisions was inconsistent with the preservation of its right to consent to settlement and held that the district court erred in granting the insurer a directed verdict. *Id.* at 820, 823.

Likewise, in *American Guarantee*, this Court granted an insured's motion for summary judgment where an insurer was notified that mediation was occurring and

only instructed its insured "to 'act as a reasonable uninsured'" and the parties then settled at mediation. 278 F.Supp.3d at 1052–53. This Court held that the insurer's failure to invoke the consent requirement before mediation, where it knew that the parties had the potential to settle, acted as an implied waiver of the provision. *Id.* at 1053.

## B.     No Reasonable Trier of Fact Could Conclude that First American Waived the Policies' Consent Requirements.

The record evidence is clear that, on July 19, 2019, the Insureds had not yet entered into a settlement with the *Detrana* Plaintiffs. On July 18, the *Detrana* Plaintiffs made a settlement demand and, on July 19, the *Detrana* Defendants responded with a counteroffer and then a modified counteroffer—but no offer was accepted by either party. [First American's Statement of Undisputed Facts, Doc. 40 ¶¶ 39–40, 42, 45.]

On the same day, Ms. Ladwig sent Mr. Howard a letter, an email, and had a telephone call with him. [*Id.* ¶¶ 43, 47–49.] In each of those communications she either expressly invoked or implicitly referenced the Policies' consent requirements. [*Id.*] In her letter that morning, she expressly invoked the consent requirements and quoted their language. [Letter Ladwig to Howard (July 19, 2019), Doc. 40-1 at PageID 639.] In her early afternoon email, she referenced the consent requirements when she stated that "I have now been informed that additional settlement discussions have occurred and the Insured may have agreed to terms proposed by the Plaintiffs that were not authorized by First American." [Email Ladwig to Howard (July 19, 2019, 2:05 p.m.), Doc. 40-1 at PageID 637.] Finally, in her email memorializing her

19

afternoon call with Mr. Howard, she indicated that she had expressly invoked the consent requirements on her call. Her email read:

> "[Y]ou indicated that Insured is aware of Paragraph 9(c) of the Conditions in the Policy indicating that First American is not liable to the Insured for settlements agreed to by the Insured without prior written consent of First American. … You indicated that settlement discussions are ongoing, and I request that First American be kept involved in settlement discussions to the extent that the Insured desires First American to contribute to the settlement."

[Email Ladwig to Howard (July 19, 2019, 3:05 p.m.), Doc. 40-1 at PageID 637.]

Thus, the material facts demonstrate that before the *Detrana* Parties entered into the Settlement, Ms. Ladwig expressly and unequivocally invoked the Policies' consent requirements. Additionally, as evidenced by Mr. Howard's deposition testimony, the Insureds were acutely aware that all roads to settlement went through Ms. Ladwig, even though they might not have liked it:

> And she was, I think, telling me that nothing was going to happen without First American being involved. And she was going to be the person at First American that was involved. And I think that was pretty much it. I mean I don't know – we didn't really discuss the 9(c) provision specifically. It was, I think, more of "This is how it's going to be, and I'm the one you need to talk to."
>
> […]
>
> It was Jessica Ladwig was going to be involved in any discussion about settling the case; and Jessica being First American.
>
> […]
>
> [I]t's not a pleasant experience having a conversation with Ms. Ladwig. She is just kind of difficult to talk to and very demanding in the way that she converses with people.

20

[Howard Dep., Doc. 40-2 at PageID 799 (73:24–74:11), 819 (153:13–15).] Therefore, from July 19 forward, it was incumbent upon the Insureds to verify that any settlement they entered into was first approved by First American in writing. They simply did not do this. And, when the *Detrana* Plaintiffs accepted their modified counteroffer five days later, they were in violation of the terms of the Policies.

Despite their clear breach of the Policies, the Insureds argue that a reasonable trier of fact could concluded that that First American implicitly waived the consent requirements when it participated in the June 2019 mediation, made contribution offers towards the Settlement, and reviewed the Settlement Agreement. [Resp. Opp'n, Doc. 44 at PageID 946–49.] Not so. The Court will take each argument in turn below.

### 1.    First American's Knowledge of the Mediation.

The Insureds argue that Ms. Barnes' participation in, and Ms. Ladwig's knowledge of, the June 2019 mediation creates a genuine issue of material fact regarding implied waiver of the consent requirements. [*Id.* at PageID 947.] This argument is unpersuasive.

As to Ms. Barnes, although she represented the Insureds for the purposes of First American's accepted claims, she had no authority to waive any of the Policies' provisions. The Insureds were put on notice of this fact when First American sent them its coverage letter. [*See* Letter Ladwig to Smith (Oct. 11, 2018), Doc. 45-1 at PageID 1048 ("Erika Barnes has not been retained to provide coverage advice to the

Insured").] Also, Mr. Howard was well aware of this fact. [*See* Howard Dep., Doc. 40-2 at PageID 827 (186:5–187:2).]

Likewise, Ms. Ladwig's knowledge that a mediation occurred is irrelevant. Certainly, *American Guarantee* establishes that, where an insurer has knowledge of a mediation, fails to invoke its consent requirement, and the parties settle, the insurer's inaction can be evidence of implied waiver. 278 F.Supp.3d at 1051–53. That fact pattern is not before the Court. Here, unlike in *American Guarantee*, the parties did not settle. Moreover, the mediation occurred before Millstone was even a party to the *Detrana* Litigation; thus, its reliance on the mediation is totally misplaced. [First American's Statement of Undisputed Facts, Doc. 40 ¶¶ 26, 30.]

Ultimately, the simple facts that a mediation occurred and First American knew about it are insufficient to establish "absolute action or inaction" with respect to the Policies' consent requirements. *Gardner*, 6 S.W.3d at 499 (citations omitted). The Insureds have offered no evidence or argument as to what First American did or did not do, or said or did not say, with regard to the mediation. [*See* Insureds' Counter-statement of Undisputed Facts, Doc. 45 ¶¶ 26, 95.] Nor have they submitted into the record the mediation statement that they argue Ms. Ladwig received and "likely" reviewed. [*Id.*] In sum, they have offered no actual evidence of First American's conduct from which a trier of fact could conclude that it implicitly waived the consent requirements.

## 2.    First American's Contribution Offers.

The Insureds argue that First American's contribution offers create a genuine issue of material fact as to whether it waived the Policies' consent requirements. [Resp. Opp'n, Doc. 44 at PageID 946–49] Not so.

As an initial matter, contrary to the Insureds' assertions, Ms. Ladwig's discussions with Fidelity's counsel regarding a potential $50,000 contribution are irrelevant to whether First American waived the consent requirements. [*Id.* at PageID 947; Insureds' Counter Statement of Material Facts, Doc. 45 ¶ 28.] The Insureds have offered no evidence that they were even aware of those email conversations between Ms. Ladwig and Fidelity's counsel when they occurred. [*See* Email Ladwig to Hawkins (July 5, 2019, 11:50 a.m.), Doc. 45-1 at PageID 1085–86.]

The record contains only one *pre-Settlement* contribution offer from First American to the Insureds—Ms. Ladwig's July 19, 2019 letter where she stated that "First American is willing to contribute $50,000 toward this settlement if the Insured is willing to provide a release of First American for any other claim related to this litigation." [Letter Ladwig to Howard (July 19, 2019), Doc. 40-1 at PageID 639.] The Insureds never responded to this offer. No reasonable trier of fact could conclude that an unacknowledged *quid pro quo* offer to contribute to a potential settlement rises to the level of an absolute repudiation of the Policies' consent requirements. Nor could it be construed as a license for the Insureds to enter into any settlement that they pleased.

Further, First Americans' other contribution offers—also unacknowledged *quid pro quo* offers—were made *after* the Insureds entered into the Settlement and are not material to whether First American waived the consent requirements. [Email Ladwig to Howard (July 26, 2019, 10:09 a.m.), Doc. 40-1 at PageID 619 ("First American agrees to pay $150,000 in exchange for a full release from our insured[.]"); Email Ladwig to Smith (Aug. 22, 2019, 5:10 p.m.), Doc. 40-1 at PageID 691 ("First American is ready willing and able to proceed with the $150,000 payment previously agreed upon in exchange for a release related to this claim matter.").] Accordingly, First American's contribution offers do not create a genuine issue of material fact.

### 3. First American's Review of the Settlement Agreement.

Finally, the Insureds argue that First American's review of, and input on, the Settlement Agreement creates a genuine issue of material fact. [Resp. Opp'n, Doc. 44 at PageID 947–48.] The Court disagrees.

Like nearly all of its contribution offers, First American's review of the Settlement Agreement occurred after the Insureds entered into the Settlement. [First American's Statement of Undisputed Facts, Doc. 40 ¶¶ 62–64; Insureds' Counter-statement of Undisputed Facts, Doc. 45 ¶¶ 97–98; First American's Reply Statement, Doc. 47 ¶ 98.] Moreover, the primary purpose of its review was to verify that it could insure titles for Millstone's houses under contract. [*Id.*] Therefore, it is immaterial to the implied waiver issue.

Ultimately, the law commands that courts strictly enforce consent requirements unless there is evidence of "conduct on the part of the insurance carrier

which is so clearly inconsistent with an intention to insist upon a strict compliance with the provision" that it implies a waiver. *Gardner*, 6 S.W.3d at 499 (citations omitted). No such evidence exists here. Rather, the evidence unequivocally shows that when Ms. Ladwig became aware of a potential settlement, she unambiguously invoked the Policies' consent requirements. Although her invocation of the consent requirements may have come at the eleventh hour of the *Detrana* Litigation, and at a time that was certainly inconvenient for the Insureds, once she raised the provisions, she preserved them as a matter of law. *Am. Guarantee*, 278 F.Supp.3d at 1052–53 (establishing that where an insurer has not already waived its rights, it can preserve them at any time).

The result here might appear harsh, but it is not unjust. *Lashlee-Rich*, 1997 WL 781896, at *7 (establishing that "an insurance contract must be interpreted and enforced as written even though it contains terms which may be thought to be harsh and unjust."). The Insureds were represented by competent counsel in Mr. Howard who, as an experienced attorney, title agent, and owner of his own title company, was intimately familiar with the standard-form insurance policies at issue in this case. [Howard Dep., Doc. 40-2 at PageID 797 (64:21–66:22); Email Howard to Shriver and Ladwig (July 25, 2019, 11:40 a.m.), Doc. 40-1 at PageID 620.] While, the Court acknowledges Mr. Howard's zealous advocacy on behalf of his clients and his genuine concern with mitigating their damages, it also recognizes that the Insureds conducted settlement negotiations and entered into the Settlement pursuant to informal business practices rather than in accord with the strict terms of the Policies.

25

It appears that the Insureds will not be left empty-handed though. As good business sense would dictate, First American is free to contribute to the Settlement at any time and, considering its counterclaim seeking to enforce a contribution agreement for $150,000 in exchange for a release by the Insureds, it appears that it intends to do just that.[*See* Corrected Am. Answer and Countercl., Doc. 18 at PageID 242–43.]

Accordingly, First American's motion for summary judgment is **GRANTED** as to the Insureds' failure to indemnify claims.

## II. Knox TL's Failure to Defend Claim

First American argues that it is entitled to summary judgment on Knox TL's breach of duty to defend claim because, even if its defense of Knox TL was untimely, Knox TL was not damaged by its breach. [Mot. Summ. J., Doc. 39 at PageID 552–53.] In response, Knox TL argues that a reasonable trier of fact could find that First American failed to timely appoint counsel and, if so, it is entitled to damages at least in the amount of its attorney's fees. [Resp. Opp'n, Doc. 44 at PageID 950–53.] The Court agrees with Knox TL.

**A.    Insurers Have a Duty to Respond to a Tender of Defense in a Reasonable Amount of Time and, When They Fail to do so, are Liable for Their Insured's Costs.**

Under Tennessee law, the duty to indemnify and the duty to defend are distinct. *St. Paul Fire & Marine Ins. Co. v. Torpoco*, 879 S.W.2d 831, 834–35 (Tenn. 1994). "The duty to defend is broader than the duty to indemnify[,]" *Travelers Indem. Co. of Am. v. Moore and Assocs., Inc.*, 216 S.W.3d 302, 305 (Tenn. 2007) (citing *id.*).

26

"[A]n insurer's duty to defend the insured is triggered 'when the underlying complaint alleges damages that are within the risk covered by the insurance contract and for which there is a *potential* basis for recovery.'" *Forrest Constr., Inc. v. Cincinnati Ins. Co*, 703 F.3d 359, 363 (6th Cir. 2013) (emphasis in original and quoting *id.*). "If even one of the allegations is covered by the policy, the insurer has a duty to defend, irrespective of the number of allegations that may be excluded by the policy." *Id.* (cleaned up). Further, "[a]ny doubt as to whether the claimant has stated a cause of action within the coverage of the policy is resolved in favor of the insured." *Moore & Assocs.*, 216 S.W.2d at 305 (citing *Dempster Bros., Inc. v. U.S. Fid. Guar. Co.*, 388 S.W.2d 153, 156 (Tenn. 1964)). Finally, when presented with a tender of defense, insurers have three options: defend the insured, outright refuse to defend the insured, or defend the insured under a reservation of rights. *See Louisville Galleria, LLC v. Philadelphia Indem. Ins. Co.*, 593 F.Supp.3d 637, 652 (W.D. Ky. 2022) (citations omitted).

Knox TL alleges that First American unreasonably delayed in responding to its tender of defense, but it has not cited any cases establishing the specific amount of time within which an insurer must respond to such a tender. The Court can find no case applying Tennessee law that is directly on point. Therefore, it must predict how a Tennessee court faced with the issue would rule. *In re Fair Fin. Co.*, 834 F.3d 651, 671 (6th Cir. 2016) ("When resolving an issue of state law, 'we look to the final decisions of that state's highest court, and if there is no decision directly on point, then me must make an *Erie* guess to determine how that court, if presented with the

issue, would resolve it.'" *quoting Conlin v. Mortg. Elec. Registration Sys., Inc.*, 714 F.3d 355, 358–59 (6th Cir. 2013)).

As a general rule, "[t]he time to respond to a tender of a defense should be no more than that reasonably necessary for the insurer to investigate the claim and judge its liability under the policy." 1 JOYCE PALOMAR, TITLE INSURANCE LAW § 11:3 (2022 ed.); *see also Wolverine World Wide, Inc. v. Am. Ins. Co.*, No. 1:19-cv-00010-JTN-ESC, 2021 WL 5548103, at *10 (W.D. Mich. June 15, 2021) (holding that "[u]nder Michigan law an Insurer with a duty to defend must defend its Insured within a reasonable time after receiving notice.") (citations omitted), *special master's report and recommendation adopted by*, No. 1:19-cv-10, 2021 WL 4841167, at *1 (W.D. Mich. Oct. 18, 2021). This general rule is complementary to Tennessee law regarding insureds' notice obligation to insurers, which provides that notice of a potential claim must be given "within a reasonable time under the circumstances of the case." *Lee v. Lee*, 732 S.W.2d 275, 276 (Tenn. 1987) (listing cases). Thus, the Court finds that a Tennessee court would adopt the rule that an insurer must respond to an insured's tender of defense within a reasonable time under the circumstances of the case.[3]

The parties also have not cited any Tennessee cases providing the remedy for an unreasonable delay in responding to a tender of defense, and the Court can find none. The general rule is, when an insurer unreasonably delays responding to its insured's tender of defense, the insurer is liable for its insured's cost of defense. *See*

---

[3] This also is in accord with the Knox TL Policy, which provides that First American shall defend Knox TL "without unreasonable delay." [Knox TL Policy, Doc. 1-1 at PageID 34.]

1 JOYCE PALOMAR, TITLE INSURANCE LAW §§ 11:3, 11:12, 11:17, 11:21 (2022 ed.); *see also Wolverine World Wide*, 2021 WL 5548103, at *13 (establishing that in instances of unreasonable delay, insurer is responsible for insureds defense costs); *Suffolk Tankers, Ltd. v. Evanston Ins. Co.*, No. 1:00 CV 3062, 2005 WL 2401897, at *2–3 (N.D. Ohio 2005) (same). Further, in the most egregious instances of delay, where insureds have been prejudiced, courts in other jurisdictions have treated insurers' delays as *de facto* refusals to defend. Thus, those courts held that, in addition to being responsible for their insureds' defense costs, the insurers relinquished their right to control the litigation and were barred from enforcing other provisions of their policies (*e.g.*, consent requirements and rights of final judgment). *Yowell v. Seneca Specialty Ins. Co.*, 117 F.Supp.3d 904, 907–09 (E.D. Tex. 2015) (holding that an insurer waived its right to control its insured's defense and was liable for its costs and attorney's fees when it took 104 days to respond to its tender of defense); *Travelers Indem. Co. of Conn. v. Centex Homes*, No. 11-CV-03638-SC, 2015 WL 5836947, at *3–5 (N.D. Cal. Oct. 7, 2015) (holding that insurer that took 131 and 135 days to respond to its insured's tenders of defense lost the right to control its defenses); *see also Marathon Ashland Pipe Line LLC v. Md. Cas. Co.*, 243 F.3d 1232, 1242–43 (10th Cir. 2001) (holding that, under Wyoming law, a four-month delay in denying a tender of defense was not cured by a later offer to defend under a reservation of rights).

Again, the Court finds that a Tennessee court would likely apply the general rule that where an insurer unreasonably delays in responding to its insured's tender of defense, it is liable for the insured's costs. Further, the Court finds that a Tennessee

court would hold that an unreasonable delay in responding to a tender of defense creates a presumption that the insured has been prejudiced by the breach. Therefore, in order to retain the right to control its insured's defense and to enforce other policy provisions, an insured must rebut the presumption by proffering competent evidence that the insured was not prejudiced by the delay.

In making these findings, the Court is guided by the rule established by the Tennessee Supreme Court in *Alcazar v. Hayes* for untimely notice by insureds; the rule provides:

> [O]nce it is determined that the insured has failed to provide timely notice in accordance with the insurance policy, it is presumed that the insurer has been prejudiced by the breach. The insured, however, may rebut this presumption by proffering competent evidence that the insurer was not prejudiced by the insured's delay.

982 S.W.2d 845, 856 (Tenn. 1998). As the Tennessee Supreme Court put it in *Alcazar*, the party "bear[ing] sole responsibility for breaching a term of the contract that was intended to preserve fairness" should have to shoulder the burden of proving that the policy should remain in force. *Id.* The Court is also guided by Tennessee law that provides that when an insurer outright refuses defense of a covered claim, it is responsible for its insured's costs of defense and waives its right to control the litigation and enforce its policy. *Forrest Constr., Inc. v. Cincinnati Ins. Co.*, 728 F.Supp.2d 955, 966 (M.D. Tenn. 2010) ("Where an insurer breaches its contract by refusing to defend, and the insured then retains counsel to protect himself or herself, the insurer cannot object to the insured's handling of the case.") (cleaned up), *aff'd*, 703 F.3d 359 (6th Cir. 2013); *Allpress v. Lawyers Title Ins. Corp.*, 405 S.W.2d 572,

574–75 (Tenn. 1966) (holding that insurer waived its consent requirement and was liable for insured's costs when it unjustifiably refused defense).

**B. A Reasonable Trier of Fact Could Find that Knox TL is Entitled to Damages Based on First American's Delay in Responding to its Tender of Defense.**

First American asks the Court to grant it summary judgment on Knox TL's breach of duty claim on grounds that Knox TL has "not shown that [it] incurred any legal fees during that interim period" between when it tendered its defense and when First American retained Ms. Barnes. [Reply, Doc. 46 at PageID 1149.] Specifically, it points out that Knox TL has not submitted invoices for attorney's fees for the interim period. *Id.*

Based on the extensive record currently before the Court and its review of relevant law, it strains to envision a scenario where First American's delay in responding to Knox TL's tender of defense prejudiced Knox TL. Nevertheless, First American has conceded that the question of breach is not appropriate for summary judgment and, thus, it is not currently before the Court. [*Id.* at 11–12.] And, because the existence and amount of Knox TL's damages are inextricably linked to the questions of whether First American unreasonably delayed in responding to its tender and, if so, whether Knox TL was prejudiced by its delay, summary judgment is improper. *See Coverdell v. Mid-South Farm Equip. Ass'n*, 335 F.2d 9, 14 (6th Cir. 1964) (establishing that proof of existence of damages and proof of the amount of damages are distinct issues).

31

Accordingly, First American's motion for summary judgment is **DENIED** as to Knox TL's breach of duty to defend claim.

## CONCLUSION

For the reasons stated above, First American's motion is **GRANTED IN PART**, as to the Insureds' failure to indemnify claims, and **DENIED IN PART**, as to Knox TL's failure to defend claim.

So ordered.

ENTER:

_____

s/J. RONNIE GREER

UNITED STATES DISTRICT COURT JUDGE
